Carroll,
No. 6362.

HORACE L. RICHARDSON & *a.*

*v.*

CURTIS SCHNEIDER & *a.*

December 29, 1972.

*Nighswander, Lord, Martin & KillKelley (Mr. David J. KillKelley* orally) for the plaintiffs.

*Sheehan, Phinney, Bass & Green* and *E. Paul Kelly (Mr. Kelly* orally) for the defendants.

GRIMES, J. The real object of this dispute is the ownership of a peninsula of land which juts into Lake Win-

nipesaukee at Green's Basin. The determination of this issue depends upon the location of the boundary line between the land of the respective parties. If the boundary line hits the shore on the Richardson side of the base of the peninsula, then the peninsula belongs to the Schneiders, and *vice versa*.

There was a trial before a Master (*Norman H. Stahl,* Esq.) who found for the plaintiffs, except for a camp and an undetermined plot of land at the tip of the peninsula which he found had been acquired by defendants' adverse possession. The master's report was accepted by the court and defendants' exceptions were transferred by *Perkins,* J.

The Richardsons and the Schneiders are owners of adjacent parcels of land bounded on one side by the lake and on the opposite side by a rangeline. Although the compass directions in the various deeds are not consistent, the lake side is generally considered to be easterly and the rangeline side to be westerly. The Schneider land lies to the south of the Richardson land. There appears to be no real dispute about the location of the southerly boundary of the Schneider land nor of the northerly boundary of the Richardson lot.

George Freese, a common grantor, had set off to him by the proprietors of the town of Moultonboro 150 acres of land sometime prior to 1819. He conveyed 50 acres of the northerly part of this land to Eliza Freese in 1819 and the balance of the land to one Sinclair in 1820. Shortly thereafter, the 50 acres by conveyance of one Moulton passed into the common ownership of Jonathan Morrison, Jr. and Josiah C. Abbott. In 1823, Morrison and Abbott acquired in common the remainder of the Freese lot from Sinclair, the grantee of Freese. In 1824, Abbott and Morrison equally divided land they described as the same lot they acquired from Sinclair. No mention was made of the land they had acquired from Moulton.

Defendants place great stress on this division line, contending that the northerly portion of the present Richardson land formerly owned by one Watson should be considered to have been part of the lot divided by Morrison and Abbott, thus moving the division line farther north. Their claim to include this land is based in part on the fact that it was conveyed to Watson by Morrison in 1826, and since they can

find no conveyance of this separate tract into Morrison, they conclude that it was part of his half of the lot he had divided with Abbott. There are other explanations however.

The master found that the Watson lot was not part of the land divided by Morrison and Abbott, and considering the evidence as a whole, we cannot say the finding was not warranted.

Plaintiffs rely mainly on the description in a deed from Bartlett to Smith dated 1914 in their chain of title. In 1913, Bartlett had conveyed to one Ralph Dodge a lot 40 by 84 rods out of the southwest corner of his lot. The range line formed the westerly boundary. In 1914, he conveyed another lot of equal size adjacent to and easterly of the first lot to Myrtle Dodge. The southeast corner of this lot is located at an iron pin and stones. There is no dispute as to the location of these two lots, but defendants deny that they form any basis for determining the division line between them and the plaintiffs.

The Bartlett to Smith deed relied on by plaintiffs uses the Dodge lot corners and sidelines as boundaries, thus furnishing the basis for the master's finding that the westerly end of the division line between the parties hereto is at the southerly boundary of the Dodge lots. The easterly boundary in the Bartlett to Smith deed is said to run "in a southerly direction following the shore, to a rocky point, to land of Robert Schneider." The master found that there were no rocky points north of the peninsula but that there was one south of the peninsula, which he found to be the one referred to in the Bartlett deed. However, he found the actual original bound to be somewhat north of this point where an extension in a straight line of the southerly boundaries of the Dodge lots would intersect the shore. This still put the point south of the peninsula so that it lies within the boundaries of the plaintiffs' land.

The master was not required to accept the rocky point boundary referred to in the Bartlett deed as the bound established by the original division between Abbott and Morrison and was entitled to prefer the straight-line extension of the southerly boundary of the Dodge lots over a line which would have to change course to reach the rocky point. The rocky

point monument could have furnished a basis of occupancy under color of title to establish title in plaintiffs by adverse possession. *Gowen* v. *Swain,* 90 N.H. 383, 386, 10 A.2d 249, 251 (1939); *Dame* v. *Fernald,* 86 N.H. 468, 171 A. 369 (1934). The defendants have no cause to complain about the master's finding on this point, however, as they take more land under the master's finding than if he had accepted the rocky point, and both points place the peninsula within the boundaries of the plaintiff's land.

The master's finding that the peninsula belongs to the plaintiffs is further supported by the fact that in several deeds in the plaintiff's chain of title, the easterly boundary is described as "on a point of land extending into the basin" and "by a point of land extending into the basin" and "thence extending into the Basin to the first mentioned bound." There is no mention of the peninsula in any of the deeds in the defendants' chain and there is no way that their land could include the peninsula if the peninsula abuts the land of the plaintiffs.

Defendants rely heavily on quantities of land stated in the deeds in support of their position. It is true that when quantities are expressed in precise terms, they may be considered in determining which of two disputed bounds is the correct one. *Rautenberg* v. *Munnis,* 108 N.H. 20, 22, 226 A.2d 770, 772 (1967). In that case, however, quantity was described to the hundredth of an acre, showing careful computation and measurement. No such situation exists here, however. In fact, defendants rely not on precise quantities expressed but on an assumption that the 150 acres stated in the setoff to Freese was in fact 200 acres. Besides, the Rautenberg case holds only that quantity may be "given weight"; it does not state that it is controlling. The master was not required to adopt the defendants' argument.

The case before the master involved substantial evidence, including some 65 exhibits. The parties submitted 152 requests for findings. The master ruled on every request individually although not required to do so in view of their excessive number and in addition submitted a voluminous report of his findings and rulings. The issues are essentially ones of fact (1) to determine, on the ground, the location

of boundaries described in the various deeds, *Rautenberg* v. *Munnis supra,* and (2) on the basis of all the evidence, to determine to which of the parties the disputed area belongs. *Russell* v. *Emerson,* 108 N.H. 518, 240 A.2d 52 (1968). Since there would be no precedential value in any further discussion of the evidence, it is sufficient to say that we hold that the master's findings as to the division line were warranted.

This leaves the issue as to the camp and land at the tip of the peninsula, title to which the master found was in the defendants by adverse possession. He was unable, however, to determine the area of adverse use and thus could not determine the extent of defendants' ownership.

There was evidence that the camp was built in 1935 by members of the Schneider family and has been occupied from time to time ever since by members of that family. Although it has been accessible only by boat, it is clearly visible from both the lake and from the peninsula itself. The evidence supported the master's finding that defendants had gained title to some portion of the peninsula by adverse possession even though he could not determine the extent of their ownership. At oral argument, it was suggested that the parties might be able to agree on the extent of this ownership if the other issues were determined. The matter is therefore remanded for further hearing as to the extent of defendants' ownership if the parties are unable to agree.

*Exceptions overruled; remanded.*

All concurred.